

# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.** _17 cr 347_ |
| **v.** | : | **DATE FILED:** _6/29/17_ |
| **CARL FREDERIC SEALEY**<br>**ERIC ENGE** | : | **VIOLATIONS:**<br>**18 U.S.C. § 1349 (conspiracy to commit** |
| | : | **wire fraud – 1 count)**<br>**18 U.S.C. § 1343 (wire fraud – 13 counts)** |
| | : | **18 U.S.C. § 2 (aiding and abetting)**<br>**Notice of Forfeiture** |



FILED
JUN 2 9 2017
KATE BARKMAN, Clerk
By _____ Dep. Clerk

## I N D I C T M E N T

### COUNT ONE

**THE GRAND JURY CHARGES THAT:**

At all times material to this indictment:

### INTRODUCTION

1.      Defendant CARL FREDERIC SEALEY held himself out as the Chairman and Chief Executive Officer of Global Standard Industries, Inc. ("GSI") and, later, SEK Industries, Inc. ("SEK").

2.      Defendant ERIC ENGE held himself out as the Vice Chairman and Chief Operating Officer of GSI and SEK.

3.      Servcorp was a multi-national company that provided executive office space, as well as, fully equipped virtual offices providing business identity packages, such as mailbox rentals, voicemail and meeting rooms.

4.      From in or about 2013 to in or about 2015, defendants CARL FREDERIC SEALEY and ERIC ENGE represented verbally, in brochures and correspondence, and on GSI's

website, that GSI was a global private equity investment firm headquartered in Philadelphia, PA and New York, NY, with corporate offices in North America, Europe, Australia, Asia and the Middle East. The defendants represented that GSI specialized in "mid-cap and large-cap ventures," managed domestic assets in excess of $15 billion and foreign-based assets in excess of $33 billion, and employed more than 500 internal and external investment and financial professionals. The defendants represented that GSI partners with high-net worth individuals, pension, municipal, sovereign and hedge fund managers worldwide in the pursuit of creating relationships that benefit from the professionalism and capital ability that GSI offered and distributed. The defendants also represented that GSI constantly had real estate closings and business takeovers underway, along with "the prearranged liquid capital, leadership expertise and implementation structure to execute the lift up of entire seasoned professional teams from organizations like Apollo, Citigroup, Morgan Stanley, Goldman Sachs and others. These active teams are delivering liquid assets in multiple categories for placement on a daily and even hourly basis."

     5.  From in or about 2013 until in or about 2015, defendants CARL FREDERIC SEALEY and ERIC ENGE and others, in conjunction with them and at GSI under their direction, solicited individuals to invest funds with GSI and typically told the individuals that their investments would be used to fund "operating capital" and short-term bridge loans toward the purchase of properties, which GSI would then "flip" for a profit. Defendants SEALEY and ENGE promised to repay the individuals' investment with 10% interest, within 30 to 90 days. Defendants SEALEY and ENGE instructed individuals to wire their investment money directly into personal or business bank accounts maintained by defendant SEALEY, a

2

personal bank account maintained by defendant ENGE, GSI's attorney, or provide them with cash.

6.      From in or about May 2013 until in or about March 2014, defendants CARL FREDERIC SEALEY and ERIC ENGE and others, in conjunction with them and at GSI under their direction, conducted the solicitation of individuals from physical office space leased from Servcorp at 1735 Market Street, Philadelphia, PA from May 2013 until March 2014, and 77 Water Street, New York, NY from August 2013 until March 2014. The defendants also leased virtual office space from Servcorp in Los Angeles, CA; London, UK; Chicago, IL; Boston, MA; Hong Kong, CHN; Singapore, MY; Dubai, UAE; and Sydney, AU. The location of GSI's offices and purported international transactions were identified on GSI's website and correspondence provided to potential investors.

7.      In or about 2015, defendants CARL FREDERIC SEALEY and ERIC ENGE, along with J.K., created SEK and, from in or about 2015 and continuing until in or about 2016, solicited individuals to invest funds with SEK with the representation that their investments would be used for short-term loans toward the purchase of properties and instructed the individuals to wire their investment money directly into personal or business bank accounts maintained by defendant SEALEY, his associate, or provide him with cash.

8.      From in or about August 2013 until in or about July 2016, individuals, who intended their monies to be used for GSI's "operating expenses" and to fund short-term loans with GSI and SEK, transferred approximately $1,442,375 by wire or checks into bank accounts maintained and controlled by defendant CARL FREDERIC SEALEY and $125,000 by wire into a bank account maintained and controlled by defendant ERIC ENGE. Individuals also

3

provided defendant SEALEY with approximately $75,950 in cash intended for these same reasons.

9.     Defendant CARL FREDERIC SEALEY applied the majority of the funds received from individuals toward his own personal benefit, including, expenditures at high-end restaurants, hotels, and retail establishments, and for spa treatments, jewelry, and helicopter-flying lessons and rides.

10.     Defendants CARL FREDERIC SEALEY and ERIC ENGE paid Servcorp a total of approximately $149,525 for the leased spaces with monies obtained from the investors.

11.     To the extent that any individuals received a portion of the money they invested, defendant CARL FREDERIC SEALEY repaid individuals by utilizing funds received from new investors to pay previous investors.

12.     At times when individuals contacted defendants CARL FREDERIC SEALEY and ERIC ENGE seeking repayment of their investment and interest payments, the defendants informed the individuals that the "deals" that their monies were intended to support had been delayed, continued to represent to individuals that they would be repaid, and, occasionally, sought additional monies from the individuals for additional "deals."

13.     Neither GSI nor SEK was a private equity investment firm and was also not the profitable ongoing business that was represented to individuals; instead GSI and SEK amounted to a slush fund and a Ponzi scheme that benefitted defendants CARL FREDERIC SEALEY and ERIC ENGE.

4

14.     From in or about 2013 to in or about 2016, approximately 21 individuals invested approximately $1,643,325 with GSI and SEK.  The investors suffered losses totaling more than $1.5 million.

## THE CONSPIRACY AND SCHEME TO DEFRAUD

15.     Beginning on a date unknown to the Grand Jury, but no later than in or about 2013, and continuing until in or about 2016, in the Eastern District of Pennsylvania and elsewhere, defendants

### CARL FREDERIC SEALEY and
### ERIC ENGE,

and others known and unknown to the Grand Jury, knowingly and willfully, combined, conspired, confederated and agreed with each other to devise schemes to defraud individuals, and to obtain money and property from the individuals, by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing and attempting to execute the schemes and artifices to defraud, transmitted and caused to be transmitted by means of wire and radio communication in interstate and foreign commerce, certain writings, signs, signals, pictures and sounds, which schemes and artifices are set forth below in substance and in part, in violation of 18 U.S.C. § 1343.

## OBJECT OF THE CONSPIRACY AND SCHEME TO DEFRAUD

16.     The object of the conspiracy and schemes to defraud was to obtain money and property from individuals by making materially false and fraudulent representations.

## MANNER AND MEANS OF THE CONSPIRACY AND SCHEME TO DEFRAUD

It was part of the conspiracy and schemes to defraud that:

5

17. Defendants **CARL FREDERIC SEALEY** and **ERIC ENGE** falsely represented that GSI was a global private equity firm with more than 500 investment and financial employees and affiliations with well-known titans in the financial services industry. The defendants also falsely represented that GSI had liquid capital and more than $15 billion in domestic assets and more than $33 billion in foreign assets that enabled GSI to constantly engage in real estate closings and business takeovers.

18. Defendants **CARL FREDERIC SEALEY** and **ERIC ENGE** conducted the solicitation of investors in physical office spaces located at 1735 Market Street, Philadelphia, PA and 77 Water Street, New York, NY, claimed to have offices located in Los Angeles, CA; London, UK; Chicago, IL; Boston, MA; Hong Kong, CHN; Singapore, MY; Dubai, UAE; and Sydney, AU, and had references to these locations in correspondence and on GSI's website to create the appearance of a legitimate global entity.

19. Defendants **CARL FREDERIC SEALEY** and **ERIC ENGE** solicited individuals to invest with GSI based on the false representation and promise that they would receive back their investment with 10% interest, typically within 30 to 90 days.

20. Defendants **CARL FREDERIC SEALEY** and **ERIC ENGE** instructed individuals to wire transfer their investment money directly into personal or business bank accounts maintained by defendant **SEALEY,** a personal bank account maintained by defendant **ENGE**, or provide defendant **SEALEY** with cash.

21. When defendants **CARL FREDERIC SEALEY** and **ERIC ENGE** were contacted by individuals seeking repayment of their investment and the interest owed to them, defendants **SEALEY** and **ENGE** falsely represented to individuals that the investment "deal"

6

that their money was intended to be used for had been delayed and the defendants sought

additional funds from the investors based on false representations about new "deals" that GSI

was about to engage in to lull the individuals into not investigating the possible misuse of their

funds.  Additionally, defendants **SEALEY** and **ENGE** threatened to withhold repayment if

investors attempted to pursue civil actions against them based on Non-Disclosure Agreements

("NDA") executed by the investors.

   22. Defendants **CARL FREDERIC SEALEY** and **ERIC ENGE**, instead of

utilizing individuals' funds as promised, diverted the funds for uses not approved by the

investors, such as their personal expenses and repayment of prior investors.

**OVERT ACTS**

   In furtherance of the conspiracy and to affect its object, the following overt acts

were committed in the Eastern District of Pennsylvania and elsewhere:

   1. In or about July 2013, defendants **CARL FREDERIC SEALEY** and

**ERIC ENGE** traveled to Lincolnton, North Carolina and solicited an investment from J.W.S.

based on the false representation that the defendants already had a number of large backers for a

business deal, but needed J.W.S.'s investment to cover attorney fees and travel expenses

associated with closing the "deal."  In return for his investment, the defendants informed J.W.S.

that he/she would obtain a two percent interest in GSI, become a GSI board member, and receive

$1.5 million.

   2. In or about August 2013, defendants **CARL FREDERIC SEALEY** and

**ERIC ENGE** resumed discussions with J.W.S. regarding a short-term loan to be utilized for

"operating capital" and promised to repay J.W.S. with interest within 90 days of closing the

7

"deal." The defendants provided wiring instructions to enable J.W.S. to transfer $125,000 to a PNC Bank account in Philadelphia, PA maintained by defendant **ENGE**.

        3.      On or about August 16, 2013, defendant **ERIC ENGE** and **CARL FREDERIC SEALEY** began to distribute $125,000 that J.W.S. wired to defendant **ENGE's** account for fees and expenses associated with closing a "deal" for purposes not approved or intended by J.W.S. and the defendants did not repay the $125,000 with interest within 90 days, as promised.

        4.      In or about October 2013, defendants **CARL FREDERIC SEALEY** and **ERIC ENGE** solicited additional monies from J.W.S. The defendants paid for J.W.S. to fly from North Carolina to Philadelphia to show him GSI's Philadelphia office and to convince him that GSI was a legitimate private equity investment firm. During the meetings, the defendants again promised to repay the monies invested by J.W.S. with interest within three weeks and provided wiring instructions to enable J.W.S. to transfer monies intended for the "deal" to accounts maintained by defendant **SEALEY** at Citizens Bank and PNC Bank in Philadelphia, PA.

        5.      On or about October 24, 2013, defendant **CARL FREDERIC SEALEY** obtained approximately $222,000 that was wired to his bank accounts by J.W.S. and began to distribute the money that was intended for operating capital associated with a real estate deal for purposes not approved or intended by J.W.S. and defendants **SEALEY** and **ERIC ENGE** did not repay the money with interest within three weeks, as promised.

        6.      On or about March 4, 2014, defendant **CARL FREDERIC SEALEY** obtained approximately $17,000 that was wired to one of his bank accounts by J.W.S. and began

to distribute the money that was intended for operating capital associated with a real estate deal for purposes not approved or intended by J.W.S. and defendants **SEALEY** and **ERIC ENGE** did not repay all of the money and interest that was due.

7.  In or about October 2013, defendants **CARL FREDERIC SEALEY** and **ERIC ENGE** solicited an investment from C.H. based on the false representation that he/she would be providing a short-term business bridge loan for "organizational expenses," i.e., "travel, initial payroll, corporate meetings, legal fees, office supplies and such additional ordinary start up expenses as Borrower deems prudent." The defendants falsely represented that the loan would be backed by real estate and C.H. would receive his/her funds back with 8 ½% interest within 30 days.

8.  In or about October 2013, defendants **CARL FREDERIC SEALEY** and **ERIC ENGE** provided C.H.'s business partner and assistant with wiring instructions to enable C.H. to transfer $60,000 to a PNC Bank account in Philadelphia, PA maintained by defendant **SEALEY**.

9.  On or about October 2, 2013, defendant **CARL FREDERIC SEALEY** obtained approximately $60,000 that was wired to his bank accounts by C.H. and began to distribute the money that was intended for organizational expenses associated with a real estate deal for purposes not approved or intended by C.H. and defendants **SEALEY** and **ERIC ENGE** did not repay the money with 8 ½% interest within 30 days, as promised.

10.  In or about November and December 2013, defendant **ERIC ENGE** solicited an additional $100,000 from C.H. based on the representation that GSI needed a short-term bridge loan as part of a "deal" that would be secured by real estate. Defendant **ENGE**

9

falsely represented that C.H. would be repaid his/her entire investment of $160,000 plus interest of $5,000 within 90 days.  Defendant **ENGE** provided wiring instructions to enable C.H. to transfer the money to defendant **CARL FREDERIC SEALEY's** Citibank account in Philadelphia, PA.

11.     On or about December 9, 2013, defendant **CARL FREDERIC SEALEY** obtained approximately $100,000 that was wired to his bank account by C.H. and began to distribute the money that was intended to be a short-term bridge loan associated with a real estate deal for purposes not approved or intended by C.H. and defendants **SEALEY** and **ERIC ENGE** did not repay any of the $160,000 and interest that was due within the promised time frame.

12.     In or about December 2013, defendants **CARL FREDERIC SEALEY** and **ERIC ENGE** solicited an investment from D.P. based on the false representation that GSI needed $500,000 to conclude an $80 million revolving credit line structure and the use of D.P.'s unencumbered real estate as collateral for securing a revolving credit line.  In return, the defendants stated that D.P. would receive his money back with interest immediately after the credit line was obtained.  On December 23, 2013, defendant **ENGE** entered into an agreement with D.P., in which D.P. agreed to transfer $250,000 to defendant **SEALEY's** Citibank account based on the same terms as before when the amount involved was $500,000.  Additionally, the agreement indicated that upon conclusion of the $80 million revolving credit line, the defendants would wire $275,000 to D.P. within one business day after the credit line closed or upon the request of D.P. after January 1, 2014.

13.     On or about December 27, 2013, defendant **CARL FREDERIC SEALEY** obtained approximately $250,000 that was wired to his bank account by D.P. and

10

began to distribute the money that was intended for the acquisition of the revolving credit line for purposes not approved or intended by D.P. and defendants **SEALEY** and **ERIC ENGE** did not repay the $250,000 and additional monies as promised.

14.     On or about December 19, 2013, December 30, 2013, and January 13, 2014, defendant **CARL FREDERIC SEALEY** sent J.W.S. a combined total of $11,000 from one of his Citibank accounts with the proceeds of a $100,000 wire transfer from C.H. on December 9, 2013 and a $250,000 wire transfer from D.P. on December 27, 2013, rather than monies derived from any real estate "deal."

15.     On various dates in or about March 2014, defendant **ERIC ENGE** solicited an investment from R.P. based on the false representation that GSI needed $12,500 to make a short-term bridge loan for "operating capital" to complete and close a "deal" on April 14, 2014. Defendant **ENGE** told R.P. he/she would be paid $12,500 and an additional 10% interest payment one banking day after the credit line closed. Defendant **ENGE** also persuaded R.P. to loan GSI another $25,000 for the same or another "deal."

16.     Between on or about March 4, 2014 and March 21, 2014, defendant **CARL FREDERIC SEALEY** obtained approximately $37,500 that was wired to his bank account by R.P. and began to distribute the money that was intended to be a short-term bridge loan associated with a real estate deal for purposes not approved or intended by R.P. and defendants **SEALEY** and **ERIC ENGE** did not repay the money with interest as promised.

17.     In or about March 2014, defendant **ERIC ENGE** falsely agreed to fund a $100 million real estate deal that D.M. was attempting to complete if D.M. provided a $50,000 short-term bridge loan so that GSI could first complete some "projects" it had underway.

11

Defendant **ENGE** provided a promissory note to D.M. that indicated D.M. would be repaid by April 15, 2014. D.M. was provided wiring instructions to enable D.M. to transfer the money to defendant **CARL FREDERIC SEALEY's** Citizens Bank account in Philadelphia, PA.

18.     On or about March 12, 2014, defendant **CARL FREDERIC SEALEY** obtained approximately $50,000 that was wired to his bank account by D.M. and began to distribute the money that was intended to be a short-term bridge loan associated with a real estate deal for purposes not approved or intended by D.M. and defendants **SEALEY** and **ERIC ENGE** did not repay the money with interest by April 15, 2014, as promised. In addition, defendant **ENGE** refused to take D.M.'s calls regarding repayment of the loan.

19.     On or about March 26, 2014, defendants **CARL FREDERIC SEALEY** and **ERIC ENGE** solicited an investment from N.We. based on the false representation that GSI had a "deal" on the horizon and needed $40,000 for "operating capital" to close the "deal." Defendants **SEALEY** and **ENGE** executed an agreement with N.We. on or about March 26, 2014, in which the defendants agreed to pay $44,000, which represented N.We.'s investment and $4,000 interest, to N.We. on or before May 1, 2014.

20.     On or about March 28, 2014, defendant **CARL FREDERIC SEALEY** obtained approximately $40,000 that was wired to his bank account by N.We. and began to distribute the money that was intended to be utilized for "operating capital to close a real estate deal for purposes not approved or intended by N.We. and defendants **SEALEY** and **ERIC ENGE** did not repay all of the money with interest as promised.

21.     On or about April 29, 2014, defendants **CARL FREDERIC SEALEY** and **ERIC ENGE** and others at GSI solicited an investment from R.F. based on the false

12

representation that GSI had upcoming "deals" involving the purchase of real estate. On or about this date, defendant **SEALEY** obtained approximately $20,000 that was wired to one of his bank account by R.F. and began to distribute the money that was intended to be a short-term bridge loan associated with a real estate deal for purposes not approved or intended by R.F., including payment to Servcorp for GSI's rental obligation.

22.     In or about June 2014, defendants **CARL FREDERIC SEALEY** and **ERIC ENGE** solicited an investment from D.J. and C.J. based on the false representation that GSI had upcoming "deals" involving the purchase of real estate in North Carolina and New Jersey, which GSI would sell for a quick profit. The defendants falsely represented that D.J. and C.J.'s investment would be utilized toward the purchase of the real estate. The defendants provided wiring instructions for D.J. and C.J. to transfer monies to defendant **SEALEY's** Citizens Bank account and had them execute a NDA so that they would not disclose GSI's purported proprietary information involving the "deals."

23.     Between on or about June 12, 2014 and June 23, 2014, defendant **CARL FREDERIC SEALEY** obtained approximately $250,000 that was wired to his bank account by D.J. and C.J. and began to distribute the money that was intended to be a short-term loan associated with a real estate deal for purposes not approved or intended by R.P. and defendants **SEALEY** and **ERIC ENGE** did not repay the money with interest as promised. Additionally, defendant **SEALEY** refused to provide D.J. and C.J. with any details about the "deals" or when they could expect the return of their monies.

24.     On or about June 16, 2014, defendant **CARL FREDERIC SEALEY** obtained the following bank/cashier's checks: a $22,000 check payable to R.F., who invested

13

$20,000; a $5,500 check payable to P.P., who invested $5,000; and, a $5,000 check payable to N.We., who invested $40,000. The checks were drawn on an account maintained by defendant **SEALEY** in which the only funds in the account at the time were derived from D.J. and C.J.

25.     In or about October 2014, defendant **CARL FREDERIC SEALEY** solicited an investment from N.Wa. based on the false representation that if N.Wa. invested $20,000 with GSI, N.Wa. would be one of a number of investors who put up the same amount of money as part of a real estate deal and obtain a $100,000 line of credit to purchase real estate. Defendant **SEALEY** informed N.Wa. that N.Wa. would get his/her money back in 90 days. Defendants **SEALEY** and **ERIC ENGE** instructed N.Wa. to wire monies to defendant **SEALEY's** TD Bank account.

26.     On or about October 27, 2014, defendant **CARL FREDERIC SEALEY** obtained approximately $17,000 that was wired to his bank account by N.Wa. and began to distribute the money that was intended to be utilized to obtain a line of credit associated with a real estate deal for purposes not approved or intended by N.Wa. and defendants **SEALEY** and **ERIC ENGE** did not repay the money within 90 days, as promised.

27.     On or about March 27, 2015, defendant **CARL FREDERIC SEALEY** falsely represented to N.Wa. that GSI needed another $8,000 for a "back-end extension" to make the "deal" happen and N.Wa. would then get his/her money in two weeks.

28..     Between March 27, 2015 and April 16, 2015, defendant **CARL FREDERIC SEALEY** obtained approximately $8,000 in the form of checks that was provided to him by N.Wa. and began to distribute the money that was intended to be utilized to obtain a line of credit for purposes not approved or intended by N.Wa. and defendants **SEALEY** and

14

**ERIC ENGE** did not repay the money within two weeks as promised.

29.     In or about November 2014, defendants **CARL FREDERIC SEALEY** and **ERIC ENGE** solicited an investment from M.D. based on the false representation that GSI would establish a line of credit for M.D. so that M.D. could purchase a building for his/her church. The defendants falsely represented that they first needed monies from M.D. and her associates to close a deal before they could establish the line of credit for M.D. In furtherance of establishing a line of credit for M.D., the defendants falsely represented to S.J., an associate of M.D., that S.J. would become the co-credit guarantor of the line of credit with an investment of $10,000. The defendants promised that S.J. would be repaid $10,000 with 10% interest within 90 days. Defendants **SEALEY** and **ERIC ENGE** instructed M.D. and S.J. to wire monies to defendant **SEALEY's** TD Bank account.

30.     Between on or about November 10, 2014 and on or about November 17, 2014, defendant **CARL FREDERIC SEALEY** obtained approximately $20,000 that was wired to his bank account and $10,000 in cash that was provided to him by M.D., S.J. and another associate of M.D. Defendant **SEALEY** distributed the money that was intended to be utilized to close a deal by GSI and obtain a line of credit for M.D. for purposes not approved or intended by M.D. and M.D.'s associates. Defendants **SEALEY** and **ERIC ENGE** did not repay the money with interest within 90 days, as promised.

31.     From in or about 2011 and continuing until in or about 2013, defendant **ERIC ENGE** informed D.B. about business deals that defendants **ENGE** and **CARL FREDERIC SEALEY** were purportedly engaged in, including, the acquisition of real estate in California, a hotel deal in Dubai, a deal in Las Vegas with George Clooney, another deal

15

involving the MGM Grand Hotel, and many other deals on the east coast. Defendant **ENGE** falsely represented to D.B. that he and defendant **SEALEY** were engaged in negotiations with New Jersey Governor Christie to pull the Revel Casino out of bankruptcy and falsely represented to D.B. that they wanted to purchase the W Hotel in New York City. Defendant **ENGE** falsely represented to D.B. that they were making millions on billion dollar deals. In or about 2015, defendant **ENGE** informed D.B. that GSI could assist D.B. in financing the purchase of real estate by D.B. obtaining a line of credit through GSI with a down payment of $70,000 and pledging unencumbered real estate as collateral. The defendants provided D.B. with wiring instructions to enable D.B. to transfer an installment of $49,000 toward the down payment to defendant **SEALEY's** Wells Fargo Bank account. Defendant **SEALEY** went to a Wells Fargo Bank in New York and deposited a $21,000 check from D.B. that represented the remainder of the down payment.

32. On or about January 7, 2015, defendant **CARL FREDERIC SEALEY** obtained a $21,000 check from D.B. and approximately $49,000 that was wired to his bank account on behalf of D.B. and began to distribute the money that was intended to be utilized to obtain a line of credit associated with a real estate deal for purposes not approved or intended by D.B., including, but not limited to, expenses at hotels, restaurants, jewelry stores, spas, and retail establishments, and did not obtain the line of credit or return the funds to D.B.

33. Beginning in or about September 2014 and continuing until in or about July 2015, defendants **CARL FREDERIC SEALEY, ERIC ENGE** and J.B.R. corresponded with Q.G. about investing with GSI and falsely represented that GSI had assets totaling more than $310 million "under the enterprise of subsidiary and affiliate accounts being employed for

16

securitization and cost expose offset," which GSI could use to arrange for Q.G. to discharge a loan he had on real estate and obtain a loan to complete construction of a hotel in Anguilla. Additionally, the defendants informed Q.G. that a portion of the loan proceeds would be used to purchase an investment bank that would be utilized for future transactions.

34.     On or about July 1, 2015, defendants **SEALEY** and **ENGE** and Q.G. executed a Memorandum of Understanding that set forth the terms of their agreement, which included the false representation that Q.G. would contribute $250,000 to retain a corporate credit guarantor for the loan and the false representation that Q.G. would be repaid within 90 days of GSI's acquisition of the loan.

35.     On or about July 1, 2015, at the direction of defendant **CARL FREDERIC SEALEY** and GSI's attorney, Q.B. wired $250,000 to GSI's attorney's bank account that Q.G. intended to be utilized to obtain a creditor guarantor and loan. Afterwards, defendant **SEALEY** instructed GSI's attorney to distribute the $250,000 to purposes not approved or intended by Q.G., including, $65,000 to settle a civil action brought by previous GSI investors, approximately $22,742 for attorney fees related to the civil action, and approximately $162,258.41 for defendant **SEALEY's** personal benefit. No one at GSI, or at their direction, obtained the credit guarantor or loan and did not repay the $250,000 to Q.G. within 90 days, as promised.

36.     In or about December 2015, defendant **CARL FREDERIC SEALEY** falsely represented to R.D. that he was engaged in a business deal that involved the acquisition of The Carlton Group, a real estate private equity investment firm in New York. Defendant **SEALEY** represented that R.D. could become a partner of SEK and obtain an ownership in the

17

newly acquired asset in return for a short-term loan of $40,000, which would be returned to R.D. with interest within 20 days.

37. On or about December 23, 2015, defendant **CARL FREDERIC SEALEY** obtained $40,000 that was wired to defendant **SEALEY's** account by R.D. and began to distribute the money that was intended for the fees and costs associated with the acquisition of The Carlton Group for purposes not approved or intended by R.D. and did not repay the money and interest to R.D. as promised.

38. In or about April 2016, defendant **CARL FREDERIC SEALEY** and R.D. solicited a one-month business loan from J.W. to fund the closing costs for a real estate "deal" that SEK and R.D. had in Fort Lee, NJ. Defendant **SEALEY** and R.D. falsely guaranteed repayment of the loan and $5,000 interest by June 9, 2016.

39. Between on or about April 27, 2016 and May 11, 2016, defendant **CARL FREDERIC SEALEY** obtained $20,000 from J.W. and began to distribute the money intended for closing costs for a real estate deal to purposes not approved or intended by J.W. and did not repay the $20,000 to J.W. as promised.

All in violation of Title 18, United States Code, Section 1349.

18

## COUNTS TWO THROUGH FIVE

### THE GRAND JURY FURTHER CHARGES THAT:

1.      Paragraphs 1 through 14 and 16 through 22 and Overt Acts 1 through 6

and 14 of Count One are realleged and incorporated herein by reference.

2.      From in or about July 2013, through in or about February 2015, in the

Eastern District of Pennsylvania and elsewhere, defendants

### CARL FREDERIC SEALEY and
### ERIC ENGE

devised and intended to devise a scheme to defraud and to obtain money and property from

J.W.S. by means of false and fraudulent pretenses, representations, and promises.

3.      On or about each of the dates set forth below, in the Eastern District of

Pennsylvania and elsewhere, defendants

### CARL FREDERIC SEALEY and
### ERIC ENGE

for the purpose of executing the scheme described above, and attempting to do so, caused to be

transmitted by means of wire communication in interstate commerce writings, signs, signals and

sounds, to wit:

| Count | Approximate Date of Wire Transmission | Description of Wire Transmission |
|-------|---------------------------------------|----------------------------------|
| 2 | August 16, 2013 | $125,000 wire transfer from TD Bank to PNC Bank account # 6553 |
| 3 | October 24, 2013 | $47,000 wire transfer from TD Bank to Citizens Bank account # 0463 |
| 4 | October 24, 2013 | $175,000 wire transfer from TD Bank to PNC Bank account # 7152 |

19

| Count | Approximate Date Of Wire Transmission | Description of Wire Transmission |
|-------|---------------------------------------|----------------------------------|
| 5 | March 4, 2014 | $17,000 wire transfer from BB&T to Citizens Bank account # 0463 |

In violation of Title 18, United States Code, Sections 1343 and 2.

20

## COUNTS SIX AND SEVEN

**THE GRAND JURY FURTHER CHARGES THAT:**

1.     Paragraphs 1 through 14 and 16 through 22 and Overt Acts 7 through 11

and 14 of Count One are realleged and incorporated herein by reference.

2.     From in or about September 2013, through in or about December 2013, in

the Eastern District of Pennsylvania and elsewhere, defendants

**CARL FREDERIC SEALEY and
ERIC ENGE**

devised and intended to devise a scheme to defraud and to obtain money and property from C.H.

by means of false and fraudulent pretenses, representations, and promises.

3.     On or about each of the dates set forth below, in the Eastern District of

Pennsylvania and elsewhere, defendants

**CARL FREDERIC SEALEY and
ERIC ENGE**

for the purpose of executing the scheme described above, and attempting to do so, caused to be

transmitted by means of wire communication in interstate commerce writings, signs, signals and

sounds, to wit:

| Count | Approximate Date of Wire Transmission | Description of Wire Transmission |
|-------|----------------------------------------|----------------------------------|
| 6 | October 2, 2013 | $60,000 wire transfer from Merrill Lynch to PNC Bank account # 7152 |
| 7 | December 9, 2013 | $100,000 wire transfer from Merrill Lynch to Citibank account # 2900 |

In violation of Title 18, United States Code, Sections 1343 and 2.

21

## COUNT EIGHT

**THE GRAND JURY FURTHER CHARGES THAT:**

1.     Paragraphs 1 through 14 and 16 through 22 and Overt Acts 17 through 18

of Count One are realleged and incorporated herein by reference.

2.     From in or about March 2014, through in or about April 2014, in the

Eastern District of Pennsylvania and elsewhere, defendants

### CARL FREDERIC SEALEY and
### ERIC ENGE

devised and intended to devise a scheme to defraud and to obtain money and property from D.M.

by means of false and fraudulent pretenses, representations, and promises.

3.     On or about March 12, 2014, in the Eastern District of Pennsylvania and

elsewhere, defendants

### CARL FREDERIC SEALEY and
### ERIC ENGE

for the purpose of executing the scheme described above, and attempting to do so, caused to be

transmitted by means of wire communication in interstate commerce writings, signs, signals and

sounds, to wit:

| Count | Approximate Date of Wire Transmission | Description of Wire Transmission |
|-------|---------------------------------------|----------------------------------|
| 8 | March 12, 2014 | $50,000 wire transfer from Wells Fargo Bank to Citizens Bank account # 0463 |

In violation of Title 18, United States Code, Sections 1343 and 2.

22

## COUNTS NINE THROUGH THIRTEEN

### THE GRAND JURY FURTHER CHARGES THAT:

1.      Paragraphs 1 through 14 and 16 through 22 and Overt Acts 22 through 24

of Count One are realleged and incorporated herein by reference.

2.      In or about June 2014, in the Eastern District of Pennsylvania and

elsewhere, defendants

### CARL FREDERIC SEALEY and
### ERIC ENGE

devised and intended to devise a scheme to defraud and to obtain money and property from D.J.

and C.J. by means of false and fraudulent pretenses, representations, and promises.

3.      On or about each of the dates set forth below, in the Eastern District of

Pennsylvania and elsewhere, defendants

### CARL FREDERIC SEALEY and
### ERIC ENGE

for the purpose of executing the scheme described above, and attempting to do so, caused to be

transmitted by means of wire communication in interstate commerce writings, signs, signals and

sounds, to wit:

| Count | Approximate Date of Wire Transmission | Description of Wire Transmission |
|-------|---------------------------------------|----------------------------------|
| 9 | June 12, 2014 | $50,000 wire transfer from Wells Fargo Bank to Citizens Bank account # 7682 |
| 10 | June 13, 2014 | $40,000 wire transfer from Wells Fargo Bank to Citizens Bank account # 7682 |
| 11 | June 13, 2014 | $80,000 wire transfer from Wells Fargo Bank to Citizens Bank account # 4171 |

23

| Count | Approximate Date Of Wire Transmission | Description of Wire Transmission |
|-------|---------------------------------------|----------------------------------|
| 12 | June 23, 2014 | $50,000 wire transfer from Wells Fargo Bank to Citizens Bank account # 7682 |
| 13 | June 23, 2014 | $30,000 wire transfer from Charles Schwab to Citizens Bank account # 7682 |

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT FOURTEEN

### THE GRAND JURY FURTHER CHARGES THAT:

1.      Paragraphs 1 through 14 and 16 through 22 and Overt Acts 33 through 34

of Count One are realleged and incorporated herein by reference.

2.      From in or about September 2014, through in or about July 2015, in the

Eastern District of Pennsylvania and elsewhere, defendants

### CARL FREDERIC SEALEY and
### ERIC ENGE,

aided and abetted by J.R., charged elsewhere, and others known and unknown to the Grand Jury,

devised and intended to devise a scheme to defraud and to obtain money and property from Q.G.

by means of false and fraudulent pretenses, representations, and promises.

3.      On or about July 1, 2015, in the Eastern District of Pennsylvania and

elsewhere, defendants

### CARL FREDERIC SEALEY and
### ERIC ENGE

for the purpose of executing the scheme described above, and attempting to do so, caused to be

transmitted by means of wire communication in interstate and foreign commerce writings, signs,

signals and sounds, to wit:

| Count | Approximate Date of Wire Transmission | Description of Wire Transmission |
|-------|---------------------------------------|--------------------------------|
| 14    | July 1, 2015                          | $250,000 wire transfer from Wells Fargo Bank to TD Bank (IOLTA) account # 8438 |

In violation of Title 18, United States Code, Sections 1343 and 2.

25

## NOTICE OF FORFEITURE #1

**THE GRAND JURY FURTHER CHARGES THAT:**

    1.    As a result of the violations of Title 18, United States Code, Sections

1343 and 1349 as set forth in this indictment, defendants

**CARL FREDERIC SEALEY** and<br>
**ERIC ENGE**

shall forfeit to the United States of America any property that constitutes, or is derived from,

proceeds obtained directly or indirectly from the commission of such offenses, including, but not

limited to, the sum of approximately $1,511,826.

    2.    If any of the property subject to forfeiture, as a result of any act or

omission of the defendants:

        (a)    cannot be located upon the exercise of due diligence;

        (b)    has been transferred or sold to, or deposited with, a third party;

        (c)    has been placed beyond the jurisdiction of the Court;

        (d)    has been substantially diminished in value; or

        (e)    has been commingled with other property that cannot be divided

        without difficulty;

it is the intent of the United States, pursuant to Title 28, United States Code, Section 2461(c),

both incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other

property of the defendants up to the value of the property subject to forfeiture.

All pursuant to Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Sections 981(a)(1)(C) .

**A TRUE BILL:**

_____

**LOUIS D. LAPPEN**
**ACTING UNITED STATES ATTORNEY**

27